SECURITIES AND EXCHANGE COMMISSION, Plaintiff,

v.

Blake A. PRATER and Wellspring Capital Group, Inc., Defendants.

Civil No. 3:03 CV 1524(MRK).

United States District Court, D. Connecticut.

Sept. 26, 2003.

Franklin C. Huntington, IV, Martin F. Healey, Scott D. Pomfret, U.S. Securities & Exchange Comm., Boston, MA, John B. Hughes, U.S. Attorney's Office, New Haven, CT, for Plaintiff.

Blake A. Prater, Guilford, CT, Pro Se.

Blake A. Prater, Guilford, CT, for Wellspring Capital Group, Inc.

## RULING ON MOTION FOR PRELIMINARY INJUNCTION, ORDER FREEZING ASSETS AND ORDER FOR OTHER EQUITABLE RELIEF

KRAVITZ, District Judge.

In this enforcement action against Blake A. Prater and his company, Wellspring

Capital Group, Inc. ("Wellspring"), the Securities and Exchange Commission ("SEC") alleges that Defendants have violated Sections 5(a), 5(c), and 17(a) of the Securities Act of 1933 (the "1933 Act") as well as Section 10(b) of the Securities Exchange Act of 1934 (the "1934 Act") and Rule 10b–5 thereunder, by operating a pyramid scheme involving the fraudulent offer and sale of unregistered securities. Presently before the Court is the SEC's Motion for Preliminary Injunction, Order Freezing Assets and Order for Other Equitable Relief [Doc. # 3] ("Preliminary Injunction Motion"), in which the SEC seeks to enjoin Defendants from continuing to violate the securities laws, to freeze certain assets and bank accounts associated with Defendants' activities, and to obtain other equitable relief, including expedited discovery. For the reasons set forth below, the Court GRANTS the SEC's Motion for Preliminary Injunction [Doc. # 3].[1]

**Procedural History**

In view of its somewhat unusual nature, the Court sets forth the procedural history of this case in detail. The SEC filed its complaint against the Defendants on September 5, 2003. On September 8, 2003, the SEC moved *ex parte* for a Temporary Restraining Order (the "TRO") enjoining Defendants from violating the securities law, freezing certain assets and accounts, and ordering expedited discovery. In support of the TRO, the SEC submitted a Declaration of Scott D. Pomfret, dated September 8, 2003 (the "Pomfret Declaration" or "Decl.") and an Appendix comprised of 16 Exhibits. The Court granted the TRO on September 8 and scheduled a hearing on the SEC's Motion for a Preliminary Injunction for September 15, 2003.

On September 11, 2003, Frank Huntington, counsel for the SEC, and William Dow—an attorney who informed the Court that he was at that time attempting to work out a representation arrangement with the Defendants—jointly requested that the hearing on September 15 be continued and they jointly consented to an extension of the existing TRO for an additional ten-day period. *See* Letter from William Dow to Frank Huntington, dated September 11, 2003, annexed as Exhibit 1 to the Supplementary Declaration of Scott D. Pomfret, dated September 22, 2003 (the "Pomfret Supplemental Declaration" or "Supp. Decl."). On that same date, Mr. Dow informed Mr. Huntington that were Mr. Prater deposed on September 12, 2003, as noticed, he would invoke his constitutional rights under the Fifth Amendment because both Mr. Prater and Wellspring were the subjects of an ongoing criminal investigation. In light of Mr. Prater's position, the SEC agreed to postpone his deposition, but the SEC reserved its right to renotice the deposition at a later time even if Mr. Prater continued to invoke his Fifth Amendment rights. *See id.*

On September 15, 2003, the Court held a telephone conference with Mr. Huntington and Mr. Dow, who had still not been officially retained as Defendants' counsel but who nonetheless represented that he had authorization from the Defendants to consent to an extension of the TRO. *See id.*[2]

---

1. The parties represented at the hearing on September 24, 2003 that they would likely be able to agree on the entry of an order for preliminary injunction. The Court gave them until 5:00 p.m. E.S.T. on September 25, 2003 to notify the Court of any such agreement. Based on letters received from counsel on September 25, it appears that the parties were unable to reach agreement by the Court's deadline.

2. At the hearing on September 24, 2003, Mr. Prater confirmed that he had, in fact, authorized Mr. Dow to consent to extension of the TRO.

Following that telephone conference, the Court extended the TRO until the close of business on September 26, 2003 and scheduled a hearing on the SEC's motion for a Preliminary Injunction for September 24, 2003. The court also ordered both parties to file any supplementary papers or briefs on the Preliminary Injunction Motion no later than September 22, 2003 and at the same time indicate whether they wished to present oral testimony at the September 24, 2003 hearing.

On September 19, 2003, Mr. Dow notified the Court by letter that he would not be representing the Defendants and that Defendants intended to obtain other counsel. Mr. Dow also informed the Court that Mr. Prater had received a copy of this Court's order extending the TRO until September 26, 2003 and that a hearing was scheduled for September 24, 2003. *See* Letter from William Dow to Hon. Mark R. Kravitz, dated September 19, 2003 [Doc. # 14].[3] Mr. Prater and Mr. Huntington were sent copies of Mr. Dow's letter.

On September 22, 2003, Joseph Cage, who represented that he was an attorney from Louisiana, called the Court and informed Chambers staff that he might decide to represent the Defendants but that he needed a continuance of the September 24 hearing. Mr. Cage was told by Chambers staff that if he wanted to raise an issue with the Court about a pending case, he would need to get his opponent, in this case counsel for the SEC, on the telephone so the Court could address both parties on the issue Mr. Cage wished to raise. Later that day, Mr. Cage once again called Chambers and informed staff that he had been unable to obtain the consent of the SEC for a telephonic conference with the Court. No motion for continuance was filed with the Court until the evening of September 23, when Mr. Prater faxed a *pro se* Motion [ Doc. # 19] requesting a continuance of the hearing scheduled for September 24. There was no indication on Mr. Prater's Motion that it had been served on the SEC, and the Court later determined from Mr. Prater that he had not served it on the SEC.

Mr. Prater appeared *pro se* at the hearing on September 24, and stated that Mr. Cage would most probably be representing him and Wellspring but that Mr. Cage had not yet formally agreed to the representation and that as a result Mr. Prater wished to represent himself *pro se*. Mr. Prater then filed a *pro se* appearance for himself [Doc. # 18], but the Court denied his request to represent Wellspring as well. *See Pecarsky v. Galaxiworld.com Ltd.*, 249 F.3d 167, 172 (2nd Cir.2001). After ascertaining from Mr. Prater that he had received notice of the original TRO, the extended TRO, and the Court's order scheduling a hearing for September 24, the Court denied his Motion for a Continuance on the ground that Defendants had sufficient opportunity to retain counsel and that a hearing on the SEC's Motion for Preliminary Injunction must proceed because the TRO would expire on September 26 and the Court could not extend it further. However, in denying Mr. Prater's Motion for Continuance, the Court assured Mr. Prater that once Defendants retained counsel, the Court would be willing to entertain on an expedited basis any motion the Defendants might choose to file to vacate, modify, or dissolve any injunction the Court might enter as a result of the hearing.

---

**3.** At the hearing on September 24, 2003, Mr. Prater confirmed that he had in fact received the Court's order as represented by Mr. Dow.

Thereafter, after being warned by the Court of the consequences of continuing to represent himself at the preliminary injunction hearing in view of his prior invocation of the Fifth Amendment and after having been granted the opportunity to consult by telephone with Mr. Cage, Mr. Prater informed the Court that he would not continue to represent himself at the hearing so as to avoid self-incrimination. As a consequence, Mr. Prater did not participate as counsel or a witness at the hearing on the preliminary injunction, though he remained present for the hearing. Wellspring was also unrepresented at, and therefore also did not participate in, the hearing.[4] Mr. Prater did file at the hearing a Petition for a Writ of Habeas Corpus [Doc. # 17], which the Court docketed and which it has considered in connection with the SEC's Motion for Preliminary Injunction. In addition, numerous individuals who claim to be purchasers of "right to receive contracts" in Wellspring and have done business with Mr. Prater have filed with the Court identical documents entitled "Affidavit of Fact and Formal Complaint" [see, e.g., Doc. ## 15 & 16], which the Court has reviewed and also considered in connection with this Motion.

As of this date, therefore, Defendants have neither proffered any legal or factual defenses to the substance of the SEC's allegations, nor sought to rebut any of those allegations through testimony or documentary evidence. Mr. Prater has declined to testify about his activities and companies, as is his right, and the SEC has been unable, through no fault of its own, to depose Wellspring's Business Manager[5] or to obtain many of the documents relating to Wellspring's operations, most of which the SEC has informed the Court are being held by the Department of Justice following searches and seizures executed at certain of Wellspring's offices in or about September 5, 2003. Regrettably, therefore, this Court is compelled to evaluate the Motion for a Preliminary Injunction based on the SEC's submissions alone, without any rebuttal from the Defendants and without even complete information regarding Defendants' activities and operations. Nevertheless, from the information that has been provided to date, it appears that Defendants have engaged in a large scale operation that has violated numerous provisions of the securities laws, including the registration and anti-fraud provisions of the 1933 Act and 1934 Act.

### Findings of Fact

Mr. Prater is the President, incorporator, director, and registered agent of Wellspring, a Connecticut corporation. (Decl., ¶ 5 & Exhibit 2). Mr. Prater and Wellspring are also affiliated with a number of other overlapping businesses. For example, Mr. Prater serves as the President and director of MpactXchange Ltd., a

---

4. The SEC did not proffer any oral testimony at the hearing but relied on the Pomfret Declaration and Supplemental Declaration as well as the exhibits attached to those declarations. In addition, the SEC submitted a Second Supplemental Declaration of Scott D. Pomfret on September 25, 2003, (the "Second Supp. Decl.") along with exhibits, as well as an Opposition to Defendant Blake Prater's Petition for Writ of Habeas Corpus, dated September 25, 2003, all of which the Court has considered in connection with the Motion.

5. The SEC has informed the Court that Wellspring's General Manager, Lloyd Low, was personally served with a subpoena ordering him to produce documents and appear for testimony on September 17, 2003. Mr. Low did not appear for his deposition and failed to produce any documents. Low's current whereabouts are unknown to the SEC. (Supp. Decl.¶ 6). The Pomfret Supplemental Declaration details the steps taken by the SEC to investigate Defendants' operations in the period between the first TRO and the hearing.

Connecticut corporation, MpactPlayers Ltd., a Vermont corporation, and Mpact-Players of Connecticut, Inc., a Connecticut corporation. MpactVentures, Ltd. is a d/b/a affiliate of Wellspring Communities Corporation ("WCC") and is linked to the Wellspring website. (*Id.*, ¶ 6 & Exhibits 3 & 4). These related entities run a series of websites, including www.wellspringcapitalgroup.com, www.mpactplayers.com, www.mpactventures.net, www.dealmakersclub.com, and www.cardealnow.com. These websites offer a number of investment schemes for participants, each promising a more astonishing rate of return than the next. On their face, they appear to underscore the wisdom of a tried and true investment axiom: If it looks too good to be true, it probably is.

One group of these schemes, the various "Defined Equity Account Limited Liability Company" programs, otherwise known as "DEAL" programs, offers "money-saving consumer and commercial financial solutions: a family of financial products sold direct to consumers and commercial entities," (Decl., Exhibit 6), a group of products "designed to help eliminate or offset a particular expense that our client's may have." (*Id.*). These programs, which Wellspring describes as "short-term income participation programs," (*id.* ¶ 8) all require investors to make upfront payments to Wellspring, in return for which they are promised substantial returns, in many cases returns of as much as 500–2000% on the initial investment. Among these products is the "CarDEAL Payment Coverage Plan," under which participants pay Wellspring a small payment in advance—usually the rebate they received from the car dealer—following which Wellspring guarantees that it will make the monthly car payments for the participant for a period of three, four, or five years. (*Id.*, Exhibit 8).

Another program, the "Rent Relief" Plan, requires participants to pay a fee equivalent to three months rent, following which Wellspring agrees to pay the participant's rent for the next two years. (*Id.*, Exhibits 6 and 10). Wellspring also offers the "Business Expense Replacement" Plan and the "Payroll Replacement Plan ('PRP')," each of which requires participants to make an upfront payment of whatever amount they wish (ostensibly the amount they spend on business expenses or payroll each week). The plan then provides that nine weeks later, the participants will begin to receive a payment of one quarter of the initial payment each week for the next forty-three weeks. (*Id.*, Exhibits 6 and 11). The return on this investment would be over 1,000 % per year, though Wellspring and its agents encouraged investors to reinvest these enormous returns rather receiving them in cash. Wellspring documents tout the "100% Reinvest" strategy, promising returns of $1,875 on an initial investment of $150 after just six months. (Supp. Decl., Exhibit 10).

That Defendants were in fact making the offerings proposed by these websites was confirmed by the SEC. On or about August 21, 2003 and in connection with the SEC's investigation of Defendants, a Mr. Pelangio inquired about the CarDEAL program and was informed by Wellspring sales representatives that if he gave Wellspring his new car rebate, Wellspring would pay his car loan obligation for the life of the loan. He was also informed with respect to the Rent Relief program that if he paid Wellspring the equivalent of three months rent (a total of $2,100), Wellspring would pay his monthly rent obligation for the next two years (a total of $16,800). This represents a return on invested capital of 800% in two years. Mr. Pelangio was also told in connection with the PRP program that if he gave Well-

46

spring $10,000, Wellspring would begin paying him $2,500 per week beginning nine weeks after his investment, and Wellspring would continue to make those monthly payments for the next 43 consecutive weeks, thus providing Mr. Pelangio a return of $107,500 on his $10,000 investment. *See* Decl., ¶ 16.

Wellspring also runs a company which attempts to derive revenue from casino gambling. Run through MpactPlayers, Ltd., teams of professional gamblers were apparently sent to casinos to employ a "proprietary system" that Mr. Prater devised for "production gambling." (Supp. Decl.¶ 23). Documents retrieved from Mr. Prater's home indicate revenues from "production gambling" of $2.9 million monthly. (*Id.*, Exhibit 12). However, one of the Team Leaders of the production gambling venture indicated to SEC investigators that the venture regularly lost money. (*Id.*, ¶ 23c & Exhibit 13). The MpactPlayers.com website solicited payments for this venture, which would be included into a "matrix," providing returns of $360 on an initial investment of $20. (*Id.*, Exhibit 11). Wellspring's gambling activities are not disclosed on the main Wellspring website.

Wellspring also runs an investment offering called "MpactVentures," which the Defendants' literature refers to as a " 'Venture Development' firm." In a statement to prospective investors, Mr. Prater described the activities of the firm as "a hybrid combination of venture capital, portfolio mergers and acquisitions, 'turnaround' management, investment banking, and finance management." (Decl., Exhibit 12). The statement indicates that the firm makes its money in a number of ways: "we buy companies, we run companies, we start companies. We manage companies we own and also those owned by others, we loan money to companies, we buy finan-

cial contracts from third party lenders, we buy and sell stocks in targeted companies for quick profit, and many other things." (*Id.*). It also offers a "125% return on investments" and a "guaranteed profit on your investment." (*Id.*).

In a September 16, 2002 email to investors, Mr. Prater describes the MpactDeal program, a program under the MpactVentures umbrella, as an "investment LLC" and describes the program "in simplified terms" that are worth quoting at length:

"[T]he money you and all other participants pay in to the LLC for your units is loaned to MpactVentures. The terms of the loan call for interest to be paid and also a percentage of the profits on whatever investments to money is ultimately used for. Since the contract is only 13 weeks long and it is difficult to make an investment and have it return a profit in that short period of time, the contract requires MpactVentures to make an advance payment against future earnings from the investment. In return for that advance profit distribution, which locks in a specified dollar amount of return on a pre-determined schedule for the DEAL holder, the loan to MpactVentures is forgiven and no additional profit distributions have to be made in the future. **Everybody wins. MpactVentures gets investment capital on very favorable terms, and the DEAL holders get an above average return paid out at a pre-determined time.**" (*Id.*, Exhibit 13) (emphasis added)

In addition, Defendants operate a group of investment funds called the "MpactFund," which includes various entities including MpactFund Partners One, LLC; MpactFund Partners Two, LLC; and MpactFund Partners Three, LLC. The DealMakerClub website describes the program as follows: "The MpactFund is a

series of Limited Liability Companies (LLCs) that serve as the Dealmaker Club's business acquisition investment vehicles. As the Club develops a portfolio of cashflow producing businesses, the income derived from the portfolio goes into the MpactFund and is distributed regularly to the LLC Partners on a pro-rated basis according to the number of units they own." (*Id.*, Exhibit 7). The program states that it is for individuals who are interested in coming together to "creat[e] substantial long-term wealth [by] leverag[ing] their resources under the direction of an experienced team of acquisition specialists." (*Id.*). Wellspring's literature also proclaims that "[a] relatively small investment, when combined with the small investments of other members and the expertise of a highly successful management team, can be leveraged to a level few individuals would ever be able to achieve on their own." (*Id.*). The SEC asserts that Mr. Prater has stated to an investigator from the Connecticut Securities and Investments Division that there were 8,000 to 10,000 customers involved in the Mpact LLCs. (*Id.*, ¶ 19).

The MpactVentures website lists a number of the companies acquired or owned by the MpactFund LLCs. One of them, Elm Electrical Supply, is stated to have recently "moved to larger facilities in anticipation of future expansion and growth. A streamlining of inventories was also implemented, along with a complete computerization of inventory receiving and sales processing." (*Id.*, Exhibit 4). However, the SEC has determined that these representations are false, as Elm Electrical has recently moved into a smaller space and no

computerization has been performed. (*Id.*, ¶ 21). The Wellspring website also states that the profit from these companies "in turn, becomes the financial resource that pays for the long-term obligations" associated with the consumer-based DEAL programs (the rent, car loan, and payroll programs). (*Id.*, Exhibit 6). However, the SEC has found no evidence that any of these companies could generate revenue remotely sufficient to support the returns promised for the various DEAL programs; indeed, these companies are either losing money or earning only modest profits. (Supp.Decl.¶ 25).[6] None of the acquired companies appear capable of producing the financial resources necessary to pay the kinds of returns that Defendants promise investors.

Nowhere in any of the literature regarding these programs, whether in documents or on the Wellspring websites, is it disclosed that Mr. Prater has an extensive criminal history, which includes convictions for fraud, theft, forgery, and possession of stolen goods, among others. (Decl., ¶ 26 & Exhibit 15). Potential Wellspring participants are instead told by Wellspring sales representatives that Mr. Prater is a "billionaire financial genius." (*Id.*, ¶ 16).

No registration statement has been filed with the SEC for any of the financial products Mr. Prater and Wellspring are marketing to the public. Nor has the SEC found any indication that Wellspring ensured that offerees of at least some of the products were registered investors. (*Id.*, ¶ 9).

These various schemes apparently generated a good deal of activity, however.

---

6. WCC, another entity controlled by Mr. Prater, has been entering into "Right–To–Receive Agreements" ("RTR") with various individuals. The RTRs represent that WCC is the beneficial owner of a unit in a limited liability company, which in turn has entered into a "loan/profit agreement" with MpactVentures, Ltd. The RTRs typically require an upfront payment by an investor in exchange for which WCC will "divert" the distributions on the loan/profit agreements to the investor. (Decl., Exhibit 14).

Indeed, the Wellspring website claims a customer base "exceeding 20,000 individuals and companies," (Decl., Exhibit 6). Furthermore, according to a financial statement that was seized from Wellspring's offices, the veracity of which is unknown at this point, these ventures generated for Wellspring almost $39 million of sales between January and July 2003. (Supp. Decl., Exhibit 3). This financial statement also offers strong circumstantial evidence that Defendants' various programs operate as a pyramid scheme for they list the cost of generating $39 million of sales as $29 million. (*Id.*). Of course, neither Mr. Prater nor Wellspring has explained these figures, but on their face they suggest precisely what the SEC has surmised, which is that Wellspring is using money received from later investors to fund payments made to earlier investors. In the absence of any refutation of this allegation or contrary evidence from Defendants and (as explained) taking into account Mr. Prater's invocation of his Fifth Amendment right against self-incrimination, the Court finds that the SEC's explanation appears correct.

Banking activity by Mr. Prater and Wellspring also appears to confirm the SEC's belief that Defendants are operating a pyramid scheme, though once again, neither Defendant has offered to provide a legitimate explanation for what the SEC has uncovered. The SEC has attempted to trace Mr. Prater's bank records and has determined that certain of the Wellspring accounts have experienced unusual activity. For example, Wellspring Capital Group Account # 4240087159 has had a significant amount of activity on a daily basis. This activity typically involves at least one deposit, usually in the range of $10,000 to $50,000, along with numerous withdrawals by check or wire transfer to individuals all over the country in amounts ranging from several hundred dollars to $3,000. During the month of July, there were 83 deposits into the account totaling $2.3 million and 1,107 withdrawals that totaled $1.5 million. The activity in the account has been steadily increasing in dollar value over the course of the summer. Other MpactPlayers Ltd. accounts demonstrate similar activity. The banks have not been able to determine the nature of a business that would produce such a volume of activity. The SpringPay operating account has also demonstrated an unusual pattern of transactions, with no activity whatsoever during July and very little during June, but with more regular activity in other months. (Decl., ¶ 30).

Furthermore, some of the funds in various Wellspring bank accounts have been transferred to accounts overseas, including accounts in Canada, the United Kingdom, Australia, and the Carribean. The banks in the United Kingdom and Canada have responded to SEC subpoenas by freezing the accounts, but have not revealed the sum of the account's contents. The SEC forwarded this Court's order to Loyal Bank, in St. Vincent, W.I., where Wellspring holds an account to which funds have been transferred from the domestic accounts, but the bank has not responded. (Supp.Decl. ¶ 11). Mr. Prater has also transferred a significant amount of assets to organizations called Goldfinger Coin & Bullion, Inc. and E-bullion Company, which back up customers' accounts with gold reserves located, at least in part, overseas. (*Id.*, ¶ 12 & Exhibits 4 & 5). However, the SEC conceded at the hearing on September 24, 2003 that it as yet has no indication that any of these financial transfers are illegitimate. That said, at this stage, the Court has not been given a legitimate explanation for these overseas transactions either and the practical result of these transactions is to place Defendants' funds outside the United States and therefore make it more

difficult for the SEC or United States investors to obtain those funds in the event the SEC's allegations are proved correct.

The SEC also indicates that between August 1, 2003 and September 3, 2003, a significant amount of funds in the Wellspring accounts have disappeared. More than $1.25 million on deposit at Bank North, N.A., was converted to cashier's checks. The SEC has been unable to determine where those cashier's checks were deposited. Additionally, two checks were cashed on Bank North accounts controlled by Mr. Prater on September 3, 2003 in the amounts of approximately $400,000 and $300,000. The SEC has not yet identified the recipient of those funds. (Second Supp. Decl. ¶ 3 & Exhibit 1)

Finally, it must be noted that upon questioning of the SEC by the Court during the hearing, the SEC acknowledged that it was not aware of any individual who has invested in any of Defendants' ventures who has lost money yet or even come forward to complain of Defendants' activities. The SEC explains that this could simply be the result of the fact that the SEC is early in its investigation or that Defendants' pyramid scheme has not yet collapsed.

Despite Prater's asserting his Fifth Amendment rights in these proceedings, he has continued to speak about this matter in public and on his website. Among his statements is recent one on the Wellspring website in which he vows to "do everything in my power to ensure that Wellspring and its programs survive," and indicates the firm will continue to do business in the future. (*Id.*, Exhibit 4).

### Conclusions of Law

The availability of a preliminary injunction in cases of alleged securities law violations derives from 15 U.S.C. § 77t(b), which provides as follows:

Whenever it shall appear to the Commission that any person is engaged or about to engage in any acts or practices which constitute or will constitute a violation of the provisions of this title, or of any rule or regulation prescribed under authority thereof, the Commission may, in its discretion, bring an action in any district court of the United States, or United States court of any Territory, to enjoin such acts or practices, and upon a proper showing, a permanent or temporary injunction or restraining order shall be granted without bond.

██ The explicit statutory authorization of a preliminary injunction in this context frees the SEC of the responsibility usually imposed on those requesting a preliminary injunction of showing the risk of irreparable injury or the unavailability of remedies at law. *SEC v. Unifund SAL*, 910 F.2d 1028, 1036 (2nd Cir.1990). The SEC must merely make a "proper showing," which the Second Circuit has stated requires the SEC to demonstrate both a prima facie case of past violations, *id.* at 1037, and a reasonable likelihood or propensity to engage in future violations. *SEC v. Cavanagh*, 155 F.3d 129, 132 (2nd Cir.1998); *SEC v. Commonwealth Chem. Sec.*, 574 F.2d 90, 99 (2nd Cir.1978). Among the factors a District Court may consider in exercising its wide discretion to determine whether an injunction is proper are: (1) the likelihood of future violations; (2) the degree of scienter involved; (3) the sincerity of defendant's assurances against future violations; (4) the isolated or recurrent nature of the infraction; (5) defendant's recognition of the wrongful nature of his conduct; and (6) the likelihood, because of defendant's professional occupation, that future violations might occur. *SEC v. Universal Major Indus. Corp.*, 546 F.2d 1044, 1048 (2nd Cir.1976); *SEC v.*

*Manor Nursing Ctrs.*, 458 F.2d 1082, 1100 (2nd Cir.1972).[7]

Furthermore, in a case such as this, the Court is entitled to, and does, draw adverse inferences from Mr. Prater's invocation of the Fifth Amendment. A party in a civil proceeding has an absolute right to assert his privilege against self-incrimination. *Baxter v. Palmigiano*, 425 U.S. 308, 318–20, 96 S.Ct. 1551, 47 L.Ed.2d 810 (1976); *LiButti v. United States*, 107 F.3d 110 (2nd Cir.1997). However, having been denied discovery on its allegations based on an assertion of the privilege, the SEC is entitled to ask this Court to draw negative inferences against Defendants. Here, the SEC has sought in an expedited fashion to learn the truth behind Defendants' business activities, but the agency has been thwarted by Defendants. Therefore, in weighing the evidence adduced by the SEC, the Court has drawn adverse inferences against the Defendants. What that means, in practice, is that as the Court has weighed the evidence on each issue, Mr. Prater's invocation of the privilege—along with the unexplained failure of Wellspring's Business Manager to attend his deposition and the failure of Defendants to submit any information or evidence in their behalf—have all acted as a thumb on the scales, tipping them decidedly in the SEC's favor.

*Prima Facie Case of Violations of the Securities Laws.* The SEC first alleges violations of Sections 5(a) and 5(c) of the Securities Act (15 U.S.C. §§ 77e(a) and 77e(c)), which prohibit the offer and sale of unregistered securities. The threshold question is thus whether Defendants' offerings fall within the meaning of "security" under the statute. The term is defined by 15 U.S.C. § 77b, which provides:

> The term "security" means any note, stock, treasury stock, security future, bond, debenture, evidence of indebtedness, certificate of interest or participation in any profit-sharing agreement, collateral-trust certificate, preorganization certificate or subscription, transferable share, investment contract, voting-trust certificate, certificate of deposit for a security, fractional undivided interest in oil, gas, or other mineral rights, any put, call, straddle, option, or privilege on any security, certificate of deposit, or group or index of securities (including any interest therein or based on the value thereof), or any put, call, straddle, option, or privilege entered into on a national securities exchange relating to foreign currency, or, in general, any interest or instrument commonly known as a "security," or any certificate of interest or participation in, temporary or interim certificate for, receipt for, guarantee of, or warrant or right to subscribe to or purchase, any of the foregoing.

Though the wide array of Defendants' offerings are not easily classified, they appear to fall comfortably within the category of "investment contract." The Supreme Court has defined that term as follows:

> An investment contract for purposes of the Securities Act means a contract, transaction or scheme whereby a person invests his money in a common enterprise and is led to expect profits solely

---

7. In considering a motion for a preliminary injunction, the Court is given discretion to rely solely on affidavits, depositions, and sworn testimony, *SEC v. Frank*, 388 F.2d 486, 490–91 (2nd Cir.1968), even including hearsay. *Federal Savings & Loan Ins. Corp. v.* *Dixon*, 835 F.2d 554, 558 (5th Cir.1987). Here, where Defendants have not proffered any evidence or defense, nor established any question of fact, the Court is entitled to rely exclusively on the evidence submitted by the SEC.

from the efforts of the promoter or a third party, it being immaterial whether the shares in the enterprise are evidenced by formal certificates or by nominal interests in the physical assets employed in the enterprise. It embodies a flexible rather than a static principle, one that is capable of adaptation to meet the countless and variable schemes devised by those who seek the use of the money of others on the promise of profits.

*SEC v. W.J. Howey Co.*, 328 U.S. 293, 298–99, 66 S.Ct. 1100, 90 L.Ed. 1244 (1946).

Aside from Defendants' regular characterizations of their own products as "contracts" and "investments" on their websites, (*see, e.g.*, Decl., Exhibits 4, 7 & 12), their products clearly fit within this definition. Among other examples, the summary of the MpactDeal program quoted above (*Id.*, Exhibit 13) explicitly states that participants' initial fees were to be invested by the company and the scheduled payments to participants would constitute an "advance profit distribution" by the company of the profit it would realize on its investments. In fact, each of the Wellspring and Mpact programs consist of participants giving the company their money with the expectation of profits, usually eye-popping returns, to be realized through the efforts of others. There can be no question that most of these programs, if not all of them, offer "investment contracts" and thus "securities" under the meaning of 15 U.S.C. § 77b.

Section 5(a) of the 1933 Act governs the sale and delivery of unregistered securities, and it provides as follows:

(a) Sale or delivery after sale of unregistered securities. Unless a registration statement is in effect as to a security, it shall be unlawful for any person, directly or indirectly—

(1) to make use of any means or instruments of transportation or communication in interstate commerce or of the mails to sell such security through the use or medium of any prospectus or otherwise; or

(2) to carry or cause to be carried through the mails or in interstate commerce, by any means or instruments of transportation, any such security for the purpose of sale or for delivery after sale

. . . .

(c) Necessity of filing registration statement. It shall be unlawful for any person, directly or indirectly, to make use of any means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell or offer to buy through the use or medium of any prospectus or otherwise any security, unless a registration statement has been filed as to such security, or while the registration statement is the subject of a refusal order or stop order or (prior to the effective date of the registration statement) any public proceeding or examination under section 8 [15 U.S.C. § 77h].

15 U.S.C. § 77e. To make out a prima facie case of a violation of section 5(a), the SEC must show that securities were offered or sold in interstate commerce and that no registration statement was filed for any such offering or sale. Once the SEC establishes a prima facie case, it falls to Defendants to prove that the securities in question are exempt from registration. *SEC v. Cavanagh*, 155 F.3d 129, 133 (2nd Cir.1998). Here, the evidence submitted by the SEC establishes a prima facie case of a violation of section 5(a), and Defendants have not asserted any exemption that would legitimate their offerings and sales. Accordingly, the Court concludes that the SEC has made a prima facie

showing that Defendants violated section 5(a) of the 1933 Act.

■ The SEC also asserts that Defendants have violated Section 17(a) of the 1933 Act (15 U.S.C. § 77q(a)) and Section 10(b) of the 1934 Act (15 U.S.C. § 78j(b)) along with Rule 10b–5 promulgated thereunder (17 C.F.R. § 240.10b–5).[8] These provisions all contain similar language prohibiting fraud in the offer and sale of securities.[9] Broadly stated, these so-called anti-fraud provisions of the securities laws prohibit devices or schemes to defraud, the obtaining of money by means of materially false or misleading statements, and transactions or courses of business that act as a fraud or deceit. They are violated when a defendant (1) makes a material misrepresentation or a material omission as to which he had a duty to speak, or used a fraudulent device; (2) with scienter;[10] (3) in connection with the purchase or sale of securities. *SEC v. Monarch Funding Corp.*, 192 F.3d 295, 308 (2nd Cir.1999). Statements or omissions are material if a reasonable investor would consider them important in the total mix of information available. *Basic Inc. v. Levinson*, 485 U.S. 224, 231–32, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988).

■ On the evidence provided, the SEC has made a prima facie case that Defendants have violated the anti-fraud provisions of the securities laws. The failure to disclose anywhere on the websites or in other materials any information

---

8. Section 10(b) provides:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange—
(b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, or any securities-based swap agreement (as defined in section 206B of the Gramm Leach Bliley Act), any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.
15 U.S.C. § 78j
Rule 10b–5 provides:
It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,
(a) To employ any device, scheme, or artifice to defraud,
(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.
17 C.F.R. 240.10b–5.

9. Section 17(a) states:

It shall be unlawful for any person in the offer or sale of any securities or any security-based swap agreement (as defined in section 206B of the Gramm–Leach–Bliley Act) by the use of any means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly—
(1) to employ any device, scheme, or artifice to defraud, or
(2) to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or
(3) to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser.
15 U.S.C. § 77q(a).

10. Violations of sections 17(a)(2) and (a)(3) do not require scienter. *See Aaron v. SEC*, 446 U.S. 680, 685–86 n. 5, 697, 100 S.Ct. 1945, 64 L.Ed.2d 611 (1980).

about Mr. Prater's extensive criminal history, including convictions for fraud, would certainly constitute a material omission which a reasonable investor might view as important in deciding whether to trust their money with Mr. Prater or his company. There also appear to have been material misrepresentations about Elm Electrical Supply and possibly other acquired companies, insofar as these companies are represented to be "the financial resource that pays for the long-term obligations" of the DEAL programs. (Decl., Exhibit 6). A reasonable investor would want accurate information about the companies that comprise the foundation of the various schemes, including their loses and questionable financial condition. Yet, as set forth above, some, if not all, of the representations made about these foundational companies on Defendants' websites and in their literature are false. Wellspring also fails to disclose that it employs professional gamblers to produce returns for some of the company's programs but that those gambling operations have sustained losses, possibly substantial losses.

Finally, though the SEC has not yet produced an airtight case with regard to its pyramid scheme allegations (nor need it at this preliminary stage of the proceeding), it has produced "evidence of an amount and quality sufficient to send a case to the trier of fact," the standard for making a prima facie case. *SEC v. Unifund SAL,* 910 F.2d 1028, 1037 (2nd Cir. 1990). This evidence consists of the absence of any other possible means by which Defendants could pay out the outlandish returns promised in their materials as well as the balance sheet indicating that Wellspring had $29 million in "cost of sales" on $39 million in sales for the first seven months of 2003. To the extent this is a pyramid scheme, any other characterization of it would unquestionably constitute a material misrepresentation.

In this regard, it is important to pause over the apparent absence at this stage of a single investor who has yet to come forward with a claim that he has lost money. The court is not unmindful of this fact. But it is not necessarily the "dog that did not bark," as I am certain Defendants would want to characterize it. It naturally takes some time for a good pyramid scheme to collapse, particularly one which encourages investors to "reinvest" their profits rather than receiving the cash they are owed. In the end, it may turn out that Defendants will eventually proffer or even establish a completely legitimate explanation for how they can make good on their exorbitant promises. But to date, the Court has not been presented with any evidence of *any* business or investment activity that would allow Defendants to provide the extravagant returns they are promising—that is, short of using the money of later investors to pay off earlier investors. There does not appear to be any engine of economic activity supporting the Wellspring empire except the additional receipts it receives from selling its products to other unknowing investors. Surely, the SEC is not required to wait until such a "rob Peter to pay Paul" scheme falls of its own weight. The SEC can seek protection now, before the harm that inevitably accompanies pyramid schemes is visited upon those unlucky enough to find themselves at the base of the pyramid. And in deciding whether to issue that injunction, this Court's paramount concern must always be the protection of the investing public.

Finally, there is no reason to believe that Defendants lacked scienter as to any of their misrepresentations, as "the element of scienter, as used in connection with the securities fraud statutes, requires a plaintiff to show that the defendant acted with intent to deceive, manipulate or de-

fraud, or at least knowing misconduct." *Grandon v. Merrill Lynch & Co., Inc.,* 147 F.3d 184, 194 (2nd Cir.1998). The SEC has made a prima facie case that Defendants acted with intent to deceive, manipulate, and defraud, and it seems obvious that Prater at the very least knew about his criminal record and knowingly did not include it on the website or in the other materials.

■ *Likelihood of Future Violations Unless Enjoined.* Having made a prima facie case of past violations of the securities laws, the SEC must still demonstrate a reasonable likelihood that unless enjoined Defendants will continue to violate the securities laws. The SEC easily meets this requirement, effectively establishing all the components of the multi-factor inquiry set forth by the Second Circuit. *See supra* at 49. Insofar as Defendants' conduct in this case reflects systematic wrongdoing rather than a mere incidental violation, it presents strong grounds for the issuance of a preliminary injunction. *SEC v. First Jersey Sec., Inc.,* 101 F.3d 1450, 1477 (2nd Cir.1996). The type of fraud alleged here reveals the highest degree of scienter, and Mr. Prater's consistent arguments in the press and on his website (though notably not at deposition or in court) professing his innocence indicate that he has no remorse about any of his practices. Moreover, his vows to continue Wellspring's operations demonstrate no inclination to abstain from running these types of programs in the future. Indeed, his past convictions for fraud further indicate the strong likelihood of continued violations. *SEC v. Mgmt. Dynamics, Inc.,* 515 F.2d 801, 807 (2nd Cir.1975) ("Certainly, the commission of past illegal conduct is highly suggestive of the likelihood of future violations."). Accordingly, the Court concludes that the SEC has made the showing required to issue an injunction

preventing Defendants from continuing to violate the securities laws.

■ The decision to continue a temporary freeze on Defendants' assets requires particularly careful consideration by the Court. *SEC v. Manor Nursing Ctrs., Inc.,* 458 F.2d 1082, 1105 (2nd Cir.1972). District Courts have "broad equitable powers to grant ancillary relief ... where necessary and proper to effectuate the purposes of the securities laws." *SEC v. Economou,* 830 F.2d 431, 438 (2nd Cir.1987). However, the Court must weigh the necessity to freeze assets so as to ensure that they will be available to compensate investors or to provide disgorgement against the possibility that the freeze itself will cause such disruption of defendants' legitimate business affairs that the assets would be destroyed and the investors would be placed in greater danger of losing their funds. *SEC v. Manor Nursing,* 458 F.2d at 1086.

Here, the SEC has made a strong case for the likelihood that Defendants' assets will be dissipated before any potential future order of disgorgement, either by transfer to unreachable overseas accounts or by Defendants' paying off the early participants in the pyramid scheme, leaving later entrants with no funds from which to collect their investments. The Court is not insensitive to the interests of those investors who want their rent paid, as promised, or their car loans paid, as promised. However, at this stage of the proceeding and given this state of the record, the Court is satisfied that were it to allow certain investors obligations to be paid by Defendants, it would jeopardize the investments of other investors in these schemes. Simply put, the Court cannot in good conscience privilege the claims of some investors to the exorbitant returns promised by Wellspring over the claims of those who more recently bought into the

scheme and whose interests would be depleted by those on the top.

The Court recognizes that the need to protect assets must also be weighed against the risk of harming any legitimate operations of Wellspring and its affiliated companies through an asset freeze. The SEC represents that none of the companies acquired by or affiliated with Wellspring have had their accounts frozen or are in danger of harm. (Second Supp. Decl. ¶ 7). The court accepts the SEC's representation. The sole exception is SpringPay, a money transfer business which appears to be an integral component of the scheme and whose accounts the SEC maintains should be frozen. There is no evidence that any of the Wellspring components besides the acquired companies conduct any legitimate business. Thus, considering carefully the potential harms to defrauded investors likely to result from the removal of the freeze and the likelihood that the assets will be dissipated, the Court concludes that a temporary freeze should continue until further order of the Court.

Having found a proper showing by the SEC on the Defendants' violation of the securities laws and propensity to continue to violate those laws, the Court will issue an order granting a preliminary injunction against Defendants, freezing assets, and granting the other equitable relief requested by the SEC, all of which the Court concludes is appropriate in this case. However, the Court remains mindful that Defendants have not yet chosen to offer their side of the story to the Court and that the injunction and temporary freeze will have a significant effect not only on Defendants but innocent investors in these schemes. Therefore, this Court repeats what it advised the parties at the hearing, which is that if Defendants believe they have a proper basis for seeking to modify, vacate, or dissolve the preliminary injunction and/or asset freeze, or any part of them, the Court will entertain such a motion on an expedited basis and is prepared to act promptly.

The Court is also aware that the SEC investigation of these matters continues and that there may be further incriminating or even exculpatory information among the records and papers seized from Wellspring's offices, much of which the SEC has to date not examined. Accordingly, the Court asks that SEC to examine and analyze the seized information as promptly as possible. Moreover, the Court will require the SEC to provide the Court with written reports on the progress of its investigation, the status of frozen assets as well as companies acquired by or affiliated with Wellspring, and the SEC's efforts to review and analyze the documents seized from Wellspring by the Department of Justice. The first such report, a copy of which shall be served on Defendants, must be filed on October 14, 2003. On the same date, the SEC will provide Defendants and the Court with the SEC's proposed timetable for bringing this case to a prompt hearing on a permanent injunction. Defendants will have one week to respond to the SEC's proposed schedule.

Accordingly, the SEC's Motion for a Preliminary Injunction, Order Freezing Assets, and Order for Other Equitable Relief [doc. # 3] is GRANTED and a separate order setting forth the terms of injunction shall issue this same date.

IT IS SO ORDERED.